UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 1:18CR10472-FDS |
| | ) | |
| | ) | |
| DESIREE DAIGLE | ) | |

**DEFENDANT'S EMERGENCY MOTION FOR REVOCATION OF DETENTION ORDER AND FOR PRETRIAL RELEASE WITH SUPPORTING MEMORANDUM OF LAW BASED ON COVID-19 CRISIS AND DEFENDANT'S MEDICAL VULNERABILITIES**

Defendant, Desiree Daigle, hereby moves, pursuant to 18 U.S.C. §§3142 & 3145(b), to enter an order revoking Magistrate Judge Bowler's order rejecting her motion for release on April 9, 2020.[1] While Ms. Daigle had previously consented to a voluntary order of detention, in light of the Covid-19 public health crisis she moved for immediate release. This was, and remains urgent, considering her multiple health conditions that place her at high risk for serious illness if exposed to the virus, as per the Center for Disease Control ("CDC").

At a hearing on April 9, 2020, Judge Bowler appeared to conclude that Ms. Daigle rebutted the presumption of detention. However, contrary to the order below, the Government has not and cannot meet its burden of persuasion demonstrating by clear and convincing evidence that there is no combination of conditions that would reasonably ensure the public safety. *See United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991). This is true when the low

---

[1] The Court issued an oral order. While the Court stated that she would issue a brief written order, because time is of the essence, and because the Court did not state by what date such an order would issue, Counsel files this appeal based upon the Court's oral order. Counsel also requested an expedited transcript on the same date as the order. Again, because of the serious and immediate health risks posed to Ms. Daigle, counsel submits this appeal based on her recollection of the Court's oral finding. See Affidavit of Counsel, attached as Exhibit 1.

risk to the public posed by a young woman with no record of convictions, and a viable and restrictive release plan is considered in the context of the very high risk of serious illness, or even death, to Ms. Daigle. Ms. Daigle suffers from diabetes, high blood pressure[2], and is obese, all of which place her at greater risk of severe complications or death in the event she contracts COVID-19 ("CV19").

Ms. Daigle presented evidence that any safety concerns could be addressed by reasonable conditions, including that he be released to his fathers' long-time partner, subjected to home-confinement, have no internet access, and subjected to statutorily mandated monitoring. Given the immediate threat posed by the CV19 pandemic, the grave health risks to her, and the infection-amplifying conditions within MCI-Framingham where she is detained, this Court should immediately release her on conditions of home confinement to the third-party custody of Kimberley Datu, his father's stable, historically employed (until CV19) and responsible partner. This Court must release her immediately to prevent a violation of her Fifth Amendment due process rights. She notes that her pretrial release could be temporary, based upon the change of conditions, ending when the pandemic ends.

## I.      PROCEDURAL BACKGROUND

Ms. Daigle is charged with sexual exploitation of a child, pursuant to 18 U.S.C. 2251(a) and (e). Ms. Daigle has been detained at MCI-Framingham since her arraignment on November 16th, 2018. She did not request release at the initial appearance, and subsequently waived probable cause, and the Court entered an order of voluntary detention "without prejudice" on

---

[2] Ms. Daigle's MCI-Framingham medical records do not report treatment for high blood pressure, but Ms. Daigle self-reports the condition and has explained that the anxiolytics she is prescribed have a side-effect of managing her blood pressure. Counsel has corroborated the reported condition with Ms. Daigle's father, and is currently seeking pre-incarceration medical records from her primary care physician.

November 19th, 2018. *U.S. v. Daigle*, 1:18CR10472, docket at 4, 6. [3] These hearings, of course, occurred well before the pandemic.

On March 27, 2020, she filed a sealed motion to requesting pretrial release on conditions, given the pandemic and her high-risk health conditions. Id. at 44. The government filed an opposition three days later, and Daigle filed a supplemental motion, responding to the Government's opposition. Id. at 45. The parties subsequently filed redacted versions of the initial motion and opposition. Id. at 46, 47.

Counsel proposed release to the residence of Ms. Daigle's father's long-time partner, Kim Datu, who has no criminal record and a long-standing employment history as a restaurant server. Ms. Datu expressed a willingness to work with probation to enforce whatever restrictions they imposed. See Exhibit 2, Affidavit of Kimberly Datu.

Magistrate Judge Bowler denied Daigle's request for release on April 9, 2020, on dangerousness grounds. Ms. Daigle hereby appeals this decision because, as discussed below, given the high risk setting of MCI-Framingham, the heightened risk created by Ms. Daigle's health conditions, and the Magistrate Judge's error in finding that probation was incapable of doing electronic monitoring, it is possible to release her with sufficient conditions to ensure that she does not pose a risk to the victim, the community, or a risk of flight.[4]

## II.    FACTUAL BACKGROUND

The Defendant will attempt to avoid rehashing CV19 factual materials already set out below, as the material – though new only a few weeks ago – is already beginning to feel well-trodden. It is, by now, well established that individuals with certain medical issues – treated or

---

[3] Ms. Daigle was represented by a different attorney at this time.
[4] The Court below did not appear to find a risk of flight.

untreated – including diabetes, high blood pressure, and obesity where the body-mass-index

exceeds 40 percent – are at risk of severe complications as a result of contracting CV19.[5] CDC

guidance notes that the risk applies to "[p]eople of all ages with underlying medical conditions,

particularly if not well controlled"[6], which implies that while poorly managing conditions

exacerbates existing risk, treating one's health conditions does not reduce one's risk down to the

level of the healthy, general public. According to preliminary data from China, 20 percent of

people with CV19 and at least *one* chronic health condition were either placed on a ventilator or

died.[7] Ms. Daigle has at least three chronic health conditions that aggravate her risk.

     Ms. Daigle's MCI-Framingham medical records reflect that she is presently being treated

for type-2 (adult onset) diabetes.[8] She manages the condition via regular, non-injection

prescription medication.[9] Ms. Daigle also, as of December 12, 2019, weighed 290 lbs. and had a

Body-Mass-Index of 51.4, which places her in the "morbidly obese" range of obesity.[10]

     The CDC has warned that anyone with a BMI of over 40, or "seriously obese" is at

heightened risk, a warning not qualified by considerations of age or ongoing treatment efforts.[11]

In a letter published on April 9th in *Clinical Infectious Diseases*, researchers at New York

University reported that analysis of data for 3,615 patients admitted to their hospital between

March 4th and April 4th demonstrated a strong relationship between obesity and admission to the

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html
[6] Id.
[7] See *Coronavirus Threatens Americans with Underlying Conditions*, The New York Times (March 12, 2020); *Who Is Getting Sick and How Sick? A Breakdown of Coronavirus Risk by Demographic Factors*, STAT News (March 3, 2020) available at https://www.statnews.com/2020/03/03/who-is-getting-sick-and-how-sick-a-breakdown-of-coronavirus-risk-by-demographic-factors/
[8] Exhibit 3: Massachusetts Dept. of Corr. Health Services Assessment Form for Desiree Daigle, dated Dec. 12, 2019 at 1. This record has been redacted, beyond the Defendant's immediately relevant medical and prescription information, to preserve the Defendant's privacy.
[9] Id. at 2.
[10] Id. At 3.
[11] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

ICU.[12] Patients aged less than 60 years with a BMI from 30 to 34 were two times (95%

confidence interval [CI], 1.6 to 2.6, $P < 0.0001$) and 1.8 times (95% CI, 1.2 to 2.7, $P = 0.006$)

more likely to be admitted to acute and critical care, respectively, the authors said, compared

with individuals with a BMI under 30. For patients in the same age-group with a BMI over 35,

the risk was 2.2 and 3.6 times higher, respectively.[13] A separate, non-peer reviewed NYU study

of 4,103 hospitalized CV19-positive patients during roughly the same time period found that

"hospitalized patients were more likely to be male (62.6% vs 39.0%) and had substantially more

comorbidities than non-hospitalized patients, particularly with regard to cardiovascular disease

(44.6% vs. 16.4%), diabetes (31.8% vs 5.4%) and obesity (39.8% vs. 14.5%)" and that – behind

being over 65 years of age – a BMI greater than 40 was the most likely factor to require

hospitalization.[14] The risk Ms. Daigle faces, as an individual with several of the CDC-identified

medical conditions, is considerable if she contracts CV19.

That CV19 is aggressively contagious is also, by this point, a matter of irrefutable fact.

Here, a comparison between the pleadings offered below and the current conditions speaks

compellingly to that point. On March 27th, when counsel filed the motion to reconsider, it

contained the following information:

> As of March 23, 2020, the new strain of coronavirus, which causes COVID-
> 19, has infected over 349,211 people, leading to at least 15,308 deaths
> worldwide.[15] As of the same date, Framingham public health officials were

---

[12] Jennifer Lighter, et al., *Obesity in patients younger than 60 years is a risk factor for Covid-19 hospital admission*, https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa415/5818333
[13] Id.
[14] Christopher Petrilli, et al., *Factors associated with hospitalization and critical illness among 4,103 patients with Covid-19 disease in New York City*, https://www.medrxiv.org/content/10.1101/2020.04.08.20057794v1.full.pdf at 10-11.
[15] Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard (Mar. 23, 2020), at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.
*See also* World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 62 (Mar.

reporting 14 cases within the city.[16]
*Def's Emerg'y Mtn To Reconsider* 1:18CR10472, docket no. 44 at *2-3.

As of April 14, 2020 – 23 days after the data cited – CV19 has now infected over 1.97 million people, leading to at least 125,196 deaths worldwide.[17] That represents increases of 466 percent and 717 percent, respectively. In Framingham, as of April 14th[th], public health officials were reporting 253 confirmed cases within the city since testing began (225 presently active cases), a 1,500 percent increase, and seven deaths.[18] As of April 14th, there have been 598,670 confirmed cases in the United States and 25,239 deaths[19]. Closer to home, as of April 14th, the Massachusetts Dept. of Public Health recorded 28,163 confirmed cases, with a total of 957 deaths, with one-day increases of 1,296 new cases and 113 new deaths from the previous day.[20]

The news from the jails and prisons on contagion has proven even more grim. Prisoners' Legal Services of Massachusetts, which has acted as a clearinghouse for information on CV19 infections within the Massachusetts prisons and jails, reports as of April 9th 68 prisoners (combined DOC and HOC, though the figure likely skews heavily toward Dept. of Correction inmates, based on prior figures) and 59 staff were confirmed cases, and three inmate deaths.[21]

---

21, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200322-sitrep-62-covid-19.pdf?sfvrsn=f7764c46_2

[16] https://www.framinghamma.gov/CivicAlerts.aspx?AID=2038, first visited March 24th, 2020. As of March 27th, that number has increased to 36 individuals, representing a 157% increase in three days. https://www.framinghamma.gov/2875/CORONAVIRUS-COVID-19

[17] Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard (April 14, 2020), at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.

[18] https://www.framinghamma.gov/2875/CORONAVIRUS-COVID-19 (As of April 14th, 2020). Counsel calculated percentage increase on the presently-active cases. The figure would, of course, be higher using the total number of confirmed cases.

[19] *Supra* at n. 17.

[20] MA Dept. of Public Health, *Coronavirus Disease 2019 (COVID-19) Cases in MA As of April 14th, 2020*, available online at https://www.mass.gov/doc/covid-19-cases-in-massachusetts-as-of-april-14-2020/download.

[21] Anecdotal evidence suggests the infection numbers should be higher and reflect a shortage of testing.

The best-estimate infection rate in the general population of Massachusetts is about 0.22 percent, while in state prisoners it is reported to be about 2.6 times higher, 0.57 percent. It is a staggering 5.8 percent at the Massachusetts Treatment Center – more than 26 times the general population. The rate is also about 1.5 times higher, 0.33 percent, for DOC employees than the general population, not including prison medical staff. To render that welter of figures visually:



Similar conditions exist on the federal side. As of April 9, there are 283 inmates and 125 staff testing positive for the disease, with confirmed cases at 37 BOP facilities and eight Residential Reentry Management Centers, nationwide. At present, 8 inmates have died.[22] According to information and statistics that BOP provided to Congress, the BOP website lists only *lab positive* tests. BOP also has additional "open" cases which they define as "suspected, presumed positive, or clinically confirmed." This includes 456 people in isolation (which means symptomatic, but not necessarily tested) and as of Tuesday (April 7th) morning, 3,850 inmates in

---

[22] https://www.bop.gov/coronavirus/.

quarantine, and 193 quarantined at RRCs. It is unclear whether these number are in addition to the lab positives on the website, or if they are included. Once again, a visual comparison of rates of infection the BOP population to the general population is helpful:



Virtually all the precautionary measures advised by state and federal health authorities are designed to keep people out of crowded places and to require "social distancing" to reduce the spread of the virus because it is highly contagious. But the recommended measures for mitigating the spread of CV19 are not readily available for incarcerated inmates or those who must interact with them. Simply put, even with best efforts by jail staff and the inmates, MCI-Framingham is an environment in which the CV19 virus has already gained a foothold and will now likely spread rapidly.[23] The progression of the disease at the Massachusetts Treatment

---

[23] Framingham Source, 17 Inmates & 7 MCI Framingham Employees Positive With COVID-19, (April

Center are instructive in how the disease can move through an institution, once introduced, and
the catastrophic results that can ensue. On March 21st, the first case of CV19 was reported in an
inmate at the Treatment Center.[24] A week later, it was 10 inmates and three staff.[25] Two weeks
later, as of April 2nd, the count was 25 inmates, six staff, and three deaths.[26] A similar trend
appears to be occurring at MCI-Framingham. On Thursday, April 9th, counsel offered the article
from Framingham Source cited above which reported four inmates and three staff had tested
positive for CV19. Four days later, Jenifer McKim– an investigative reporter with WGBH and a
Boston University journalism professor – reports that those numbers have climbed to 22 inmates,
five staff, and two vendor staff.[27]

Fearing a looming crisis, voices in Congress in March urged the Department of Justice to
"do all they can to release as many people as possible who are currently behind bars and at risk
of getting sick." *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to
Attorney General William P Barr ("With large numbers of people living in close proximity to
one another, many of them elderly or living with chronic diseases, DOJ must act now to save
lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners
into federal facilities is slowed significantly and that prisoners who can and should be released
are released forthwith. We cannot wait any longer to take action.");[28] The Department of Justice
has reacted to that mounting pressure – and in the face of the undeniable spread of COVID-19 in
the B.O.P. system over the past month - and recently issued guidance to prosecutors, urging them

---

10) available at https://framinghamsource.com/index.php/2020/04/10/17-inmates-7-mci-framingham-employees-positive-with-covid-19/
[24] https://www.plsma.org/covid-19-in-ma-prisons-and-jails/
[25] Id.
[26] Id.
[27] https://twitter.com/jbmckim/status/1249814890279247872
[28] Available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf.

to balance public risk posed by the defendant against that posed by the pandemic, counseling discretion in seeking detention in new cases, and to consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic. Even with the extensive precautions we are currently taking, each time a new person is added to a jail, it presents at least some risk to the personnel who operate that facility and to the people incarcerated therein. It also presents risk to the individual being remanded into custody—risk that is particularly acute for individuals who are vulnerable to a serious infection under the Centers for Disease Control and Prevention ("CDC") Guidelines."[29]

This Court has also recognized the significant shift in the detention risk-assessment that has occurred in the past 45 days and has begun to release previously detained pre-trial defendants. *See, e.g, United States v. Ramos,* No. 3:18-cr-30009-FDS, Dkt. No. 168 (D. Mass. March 26, 2020) (releasing defendant despite oral objection from government)*; United States v. Camara,* No. 1:19-cr-10442-IT-1, Dkt. No. 49 (D. Mass. March 27, 2020) (released with assent from government)*; United States v. Rodriguez*, No. 1:20-mj-06145-MPK-1, Dkt. No. 17 (D. Mass. April 1, 2020) (released over government objection)*; United States v. Miranda,* No. 1:19-cr-10446-RGS-3, Dkt. No. 57 (D. Mass. April 7, 2020) (granting pre-trial release over government objection). This Court has also begun to release individuals held in custody in Massachusetts institutions on ICE detainers, *Savino et al. v. Hodgson et al.*, 1:20CV10617-WGY, and post-conviction/supervised release offenders, *United States v. Calhoun*, No. 1:10-cr-10082-DPW, Dkt. No. 151 (D. Mass. March 31, 2020) (with assent from government and probation, granting release pending SR revocation hearing); *United States v. Sanderson*, No.

---

[29] AG William Barr, MEMORANDUM FOR ALL HEADS OF DEPARTMENT COMPONENTS AND ALL UNITED STATES ATTORNEYS, (April 6, 2020), available online at https://www.justice.gov/file/1266901/download

1:14-cr-10168-FDS, Dkt. No. 215 (D. Mass. April 6, 2020) (with assent from government and probation, granting compassionate release). Other Federal Courts are also following suit. *United States v. Webster,* No. 19-cr-211-JL, Dkt. No. 32 (D. N.H. April 1, 2020) (released over government objection)*; United States v. Monroe*, No. 1:20-cr-00011-JJM-LDA-1, Dkt. No. 25 (D.R.I. April 6, 2020) (granting release pending sentencing over government objection); *United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting release based on the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" which places inmates, in particular, at "heightened risk"); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement order because "we must take every necessary action to protect vulnerable populations and the community at large"); *See also United States v. Jose Perez*, Amended Order, No. 19-cr-00297-PAE (S.D.N.Y. Mar. 19, 2020) (ECF No. 62) (ordering defendant's temporary release from custody "based on the unique confluence of serious health issues and other risk factors facing this defendant, including but not limited to the defendant's serious progressive lung disease and other significant health issues, which place him at a substantially heightened risk of dangerous complications should be contract COVID-19 as compared to most other individuals.").

In its opposition to Ms. Daigle's initial motion to reconsider detention, the Government cited to a recent ruling by Judge Young, *United States v. Moore-Bush*, where the court denied a similar request for reconsideration for a defendant at MCI-Framingham who suffered from diabetes. *U.S. v. Moore-Bush*, 3:18-cr-30001-WGY. The Government argued, and Judge Young agreed, that Ms. Moore-Bush would be safer and more effectively protected from CV19 and her underlying conditions, by the Dept. of Corrections' precautions at MCI-Framingham than if she were released and allowed to self-manage her health. Ms. Daigle subsequently argued, in a reply

motion, factors that distinguish her case from Ms. Moore-Bush'. *U.S. v. Daigle*, 1:18CR10472 docket no. 45 at 3-4. Counsel would take a moment to note an additional consideration that has emerged since that pleading was filed: Ms. Moore-Bush has since tested positive for CV19 and is now in the MCI-Framingham infirmary.[30]

### III.   LEGAL FRAMEWORK

### 1.   The Bail Reform Act Legal Framework

Pursuant to 18 U.S.C. §3145(b), the District Court has the authority to review an order of a defendant's pretrial detention. Upon consideration of a defendant's motion, the District Court may vacate and/or amend the detention order after a de novo review. *United States v. Tortora*, 922 F.2d 880, 883 n.4 (1st Cir. 1990). A defendant may only be detained prior to trial if the court finds by clear and convincing evidence that the defendant is a danger to the community or presents a serious risk of fleeing the jurisdiction. *See* 18 U.S.C. § 3142(f); *Patriarca,* 948 F.2d at 792. In this case, Ms. Daigle states that detention is neither mandatory under the law nor reasonable, necessary, or consistent with the policies of the Bail Reform Act of 1984. See 18 U.S.C. §§ 3141 et seq.

As the Supreme Court has recognized, pretrial detention is an exceptional step and detention prior to trial is to be a carefully limited exception. *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial … is the carefully limited exception.") This presumption of release is encapsulated in the Bail Reform Act, 18 U.S.C. § 3142, which states that the Court "shall order" pretrial release, § 3142(b), except in narrow circumstances. Even if the Court determines under § 3142(c) that an unsecured bond is

---

[30] Ex. 1 at ¶9.

not sufficient, the Court "shall order" release subject to "the least restrictive further conditions" that will "reasonably assure" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), as reprinted in 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors non-detention.").

## 2. The Fifth Amendment Protects the Right of Pretrial Detainees to be Receive Adequate Medical Care and to be free from Pre-Conviction Punishment

A pretrial detainee's freedom from pretrial confinement is a fundamental right protected by the Due Process Clause; any government action infringing on this right must be narrowly tailored to achieve a compelling government interest. *United States v. Salerno*, 481 U.S. 739, 755 (1987).[31]

## IV.   ARGUMENT

---

[31] The constitutional protections of pretrial detainees arise under the Fifth Amendment Due Process Clause, which provides protection even greater than the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Eighth Amendment, which applies to persons convicted of criminal offenses, allows punishment as long as it is not cruel and unusual, but the Fifth Amendment's due process protections do not allow pretrial punishment at all. *Id.* Although the Government has an interest in detaining a defendant to secure their appearance at trial, Government may only subject a detainee "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37.  In *Kingsley v. Hendrickson*, the Supreme Court affirmed the Due Process Clause's prohibition on pretrial punishment, and elaborated that "if the condition of confinement being challenged 'is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment.'" 135 S. Ct. 2466, 2470 (2015); In addition, pretrial detainees have a substantive due process interest in freedom from deliberate indifference to their medical needs. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Furthermore, in *Brown v. Plata*, Supreme Court explained that a prisoner "may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."  563 U.S. 493, 510–11 (2011).  While prisoner claims in *Brown v. Plata* arose under the Eighth Amendment, pretrial detainees likewise have the legal right to adequate medical care, given that their rights are at least as great as those of convicted persons being punished by imprisonment.

1. **Ms. Daigle is an Appropriate Candidate for Release Under the Bail Reform Act**

Analysis under the Bail Reform Act shows that Ms. Daigle is neither a serious flight risk nor a danger to the community, and this Court should grant her release, at least until the pandemic ends.

Pursuant to 18 U.S.C. § 3142(e)(3)(E), a presumption exists that Ms. Daigle be detained because she is charged with an offense involving a minor victim under section 2251(a). A defendant can successfully rebut the presumption of detention simply by producing any evidence that the defendant is not a flight risk or danger to the community, and the defendant need not produce much evidence to rebut the presumption. *See, e.g., United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985)(holding that a defendant only has a burden of production and only needs to produce "some evidence" to rebut the presumption); *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)(stating that a defendant has a burden of production and only needs "to offer some credible evidence contrary to the statutory presumption"); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985)(stating that the burden of persuasion rests with the government, not the defendant).

Indeed, the presumption of detention is rebutted by "[a]ny evidence favorable to a defendant that comes within a category listed in 3142(g)…including evidence of their marital, family and employment status, ties to and role in the community…and other types of evidence encompassed in 3142(g)(2)." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)(emphasis added). Any "evidence of economic and social stability" can rebut the presumption. *Id*. As long as the defendant "come[s] forward with some evidence" pursuant to § 3142(g), the presumption of flight risk and dangerousness is definitively rebutted. *Id.* ("Once this burden of production is met, the presumption is 'rebutted.'") (quoting *Jessup*, 757 F.2d at 384).

### a. Conditions of Release Can Ensure Her Appearance in Court

Ms. Daigle has rebutted the presumption that she is a serious flight risk. Her medical conditions, the pandemic, and conditions of release ameliorate any flight concerns. She is a United States citizen who has lived in Massachusetts her entire life. Ms. Daigle is indigent, has multiple medical conditions and has little to no incentive, to say nothing of the required means, to flee.

If released, Ms. Daigle has secured a residence where she can remain in home confinement. The homeowner, Kimberley Datu, is a family friend and is the partner of Ms. Daigle's father. [32] She has no children in the home, and lives with her adult son. [33] Neither Ms. Datu nor her son have a criminal record, and neither uses illegal drugs or smokes marijuana.[34] Ms. Datu is a lifelong Massachusetts resident, and has lived at the proposed location for the past nine years.[35] Ms. Daigle understands that she would potentially not be allowed to leave the confines of Ms. Datu's home. Under the current circumstances, she has no desire to do so.

### b. Ms. Daigle is Not a Danger to the Community

Ms. Daigle poses a minimal danger to the community, and the risk posed can be safely addressed through statutorily required electronic monitoring, oversight by Ms. Datu in the role of a third-party custodian, and release conditions like internet-usage and association restrictions.

In finding that there were no conditions that could reasonably ensure the safety of the community, the Magistrate stated that she relied, at least in part, on the concerns raised in the victim statements submitted to the Court (under seal). Counsel objected to the Court's

---

[32] Exhibit 2, Affidavit of Kimberly Datu at ¶7.
[33] Id. at ¶4.
[34] Id. at ¶¶5, 12.
[35] Id. at ¶¶2,6.

consideration of the portions of these statements that were effectively, victim impact statements. Of course, relying on the emotional response and instinctive fears of the alleged victim's parents would be improper as Ms. Daigle retains her presumption of innocence.  Counsel argued, that to the extent that these statements raised specific safety concerns, each one of those concerns could be addressed through electronic monitoring, home confinement, and restriction of internet use.[36] The concern of the victim's family notwithstanding, this Court is capable of ensuring the safety of the community via restrictions on Ms. Daigle's movements and activities. First and foremost, home confinement enforced by electronic monitoring further reduces the minimal risk posed by Ms. Daigle to the limited geographical scope of the confines of Ms. Datu's house.

During the April 9th hearing, MJ Bowler expressed doubt that electronic monitoring would not be possible, given that Probation could not impose such monitoring during the CV19 crisis.  This concern was misplaced. In fact, GPS monitoring is statutorily mandated if Ms. Daigle is released; the offense with which she is charged is one identified under the Adam Walsh Act which requires electronic monitoring during the period of pretrial release. 18 U.S.C. 3142(c)(1)(B)(xiv). Both before and again after the hearing, Counsel confirmed with Probation that they would impose monitoring in statutorily mandated (and other) circumstances, current health conditions not-withstanding.[37] After the hearing, Probation confirmed that the have done this in multiple cases recently.[38]

Moreover, Ms. Daigle has agreed to restrictions or prohibitions on her use of internet-enabled devices, if released, and will abide by restrictions against her associating with persons under the age of 18. Ms. Datu, who has agreed not only to host Ms. Daigle, but also to serve as a

---

[36] Ex. 1 at ¶¶4, 7.
[37] Id. at ¶7.
[38] Id.

third-party custodian to ensure Ms. Daigle observes the court appointed conditions, has stated that there are only adults within her home, and that all internet-ready devices within the house can be password-protected to prevent Ms. Daigle from gaining access to them.[39]

Moreover, statistics show that offenders like Ms. Daigle are actually a very low risk to violate conditions of release. In 2012, the Bureau of Justice Statistics (BJS) published a report regarding the rate of release violations for offenders in federal court.[40] It showed that only 19 percent of defendants released pre-trial violated the conditions of their release, and 90 percent of those violations were technical violations.[41] Only 4 percent of defendants released pretrial were rearrested for new offenses, and only 1 percent of those released failed to appear as required for court proceedings.[42] Released defendants with substantial criminal histories engaged in pretrial misconduct more frequently than defendants, like Ms. Daigle, with less serious criminal backgrounds.[43]

Further, recidivism rates for individuals even after convicted of a sex offense are generally lower than those convicted of a conventional offense. A separate BJS study of recidivism among sex offenders after release from state prison found that while an estimated 83% of the 401,288 prisoners released in 30 states in 2005 were arrested for a new crime within nine years of release, the percentage of released prisoners arrested the same time span for any type of crime after serving time for rape or sexual assault was 67 percent.[44] Though that was higher than for prisoners released after serving time for homicide (60 percent), it was nonetheless

---

[39] Exhibit 2, Datu Affidavit at ¶¶1, 4, 10, 14.
[40] Cohen, Thomas H., *Pretrial Release and Misconduct in Federal District Courts, 2008-2010*, Nov. 2012, available at https://www.bjs.gov/content/pub/pdf/prmfdc0810.pdf.
[41] *Id.* at 1.
[42] *Id.* at 13.
[43] Id at 14.
[44] Alper & Durose, Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14), May 2019, available at https://www.bjs.gov/content/pub/pdf/rsorsp9yfu0514.pdf.

lower than for prisoners released after serving time for robbery (84 percent), assault (83 percent) or for property (88 percent), drug (84 percent), or public-order (82 percent) offenses.[45] For female offenders released from state prisons after serving time for rape or sexual assault, the cumulative percentage of re-arrests for each year following release was similarly below the average for all female prisoners.[46] Those results track with scientific literature supporting the proposition that sex offenders are considerably less likely to reoffend, and that *female* offenders are at a comparatively even lower risk to re-offend and are especially unlikely to reoffend sexually.[47]

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Particularly given the amplified risk to Ms. Daigle's life, under the current circumstances, she should be released under whatever conditions the Court deems appropriate.

## CONCLUSION

Ms. Daigle requests that this Court to release her subject to the proposed conditions as soon as possible. This release can be temporary until the pandemic ends. Counsel has conferred with the AUSA assigned to this matter who objects to release but has no objection to this Court hearing this motion as soon as possible.

---

[45] Id. at 4.

[46] Id. at 14.

[47] See, e.g., Katherine Peterson, Kathleen Colebank, and Lucille Motta, *Female Sexual Offenders, A Presentation for The 20th Annual ATSA Research and Treatment Conference*, Commonwealth of Kentucky Department of Correction Sex Offender Treatment Program (2001). (Of the female sample studied (N=115), there was no documented evidence of new sexual charges or convictions.); Roderic Broadhurst and Nini Loh, *The Probabilities of Sex Offender Rearrest*, Criminal Behaviour and Mental Health, 13: 125-143 (2003). (A study of 2785 sexual offenders in Western Australia with an average of 5.7 follow up years found that of the 43 women who had been incarcerated for sexual offenses 0 recidivated.); Franca Cartoni and R. Karl Hanson, *A Review of the Recidivism Rates of Adult Female Sexual Offenders*, Public Safety and Emergency Preparedness Canada: Correctional Service of Canada, 2005, http://www.csc-scc.gc.ca/research/r169-eng.shtml (last visited 2/14/2019).("A weighted average across studies resulted in an observed sexual recidivism rate for female offenders of 1.0%...").

Respectfully submitted,
The Defendant, Desiree Daigle
By her attorney,

/s/ Jessica Hedges
Jessica Hedges BBO# 645847
Hedges & Tumposky, LLP
50 Congress St. Suite 600
Boston, MA 02109
T) 617/722-8220
E) hedges@htlawyers.com

## **CERTIFICATE OF SERVICE**

I, Jessica D. Hedges, hereby certify that on this 14th day of April, 2020, I served one true and correct copy of this motion where unable to do so electronically on all record of counsel in this matter.

/s/ Jessica D. Hedges
Jessica D. Hedges

## **L.R. 7.1 Certification**

I, Jessica D. Hedges, hereby certify that I conferred with the AUSA in this matter in an attempt to narrow the issues addressed herein.

/s/ Jessica D. Hedges
Jessica D. Hedges